AK STEEL CORPORATION, Inland Steel Industries, Inc., Bethlehem Steel Corporation, U.S. Steel Group—a Unit Of USX Corporation, LTV Steel Co., Inc. National Steel Corporation, Plaintiffs,

v.

UNITED STATES, Defendant,

and

Pohang Iron and Steel Co. Ltd., Pohang Coated Steel Co. Ltd., and Pohang Steel Industries Co. Ltd., Defendant Intervenor, and Union Steel Manufacturing Co. Ltd., Defendant Intervenor, and Dongbu Steel Co. Ltd., Defendant Intervenor,

and

Union Steel Manufacturing Co. Ltd., Defendant Intervenor,

and

Dongbu Steel Co. Ltd., Defendant Intervenor.

Slip Op. 98–159.
Court No. 97–05–00865.

United States Court of International Trade.

Dec. 22, 1998.

Dewey Ballantine LLP (Michael H. Stein, Bradford L. Ward, Elizabeth A.B. McMorrow, Kristen M. Neller, and Jennifer Danner Riccardi), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau), Bernd G. Janzen, Attorney, Office of the Chief Counsel of Import Administration, United States Department of Commerce, of counsel, Washington, DC, for defendant.

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Sukhan Kim, Spencer S. Griffith, and Samuel C. Straight), Washington, DC, for defendant–intervenors Pohang Iron and Steel Co. Ltd., Pohang Coated Steel Co. Ltd., and Pohang Steel Industries Co. Ltd.

Kaye, Scholer, Fierman, Hays & Handler, LLP (Donald B. Cameron, Julie C. Mendoza, Raymond Paretzky, and John P. Healy), Washington, DC, for defendant-intervenors Union Steel Manufacturing Co. Ltd. and Dongbu Steel Co. Ltd.

## OPINION

RESTANI, Judge:

This matter is before the court on a Motion for Judgment on the Agency Record,

pursuant to USCIT Rule 56.2, filed by AK Steel Corporation, Inland Steel Industries, Inc., Bethlehem Steel Corporation, U.S. Steel Group—A Unit of USX Corporation, LTV Steel Co., Inc., National Steel Corporation (collectively "AK Steel" or "Domestic Producers"), who challenge certain aspects of Commerce's antidumping duty administrative review in *Certain Cold–Rolled and Corrosion–Resistant Carbon Steel Flat Products from Korea*, 62 Fed.Reg. 18404 (Dep't Commerce 1997) (final results of antidumping administrative review) [hereinafter "*Final Results*"]. Pohang Iron and Steel Co. Ltd. ("POSCO"), Pohang Coated Steel Co. Ltd. ("POCOS"), and Pohang Steel Industries Co. Ltd. ("PSI");[1] Dongbu Steel Co. Ltd. ("Dongbu"); and Union Steel Manufacturing Co. Ltd ("Union") appear as Defendant–Intervenors (collectively "Foreign Producers") to the Domestic Producers' Motion.

The Department of Commerce ("Commerce") issued an antidumping duty order on certain cold-rolled and corrosion-resistant carbon steel flat products from Korea. *Certain ColdRolled Carbon Steel Flat Products and Certain Corrosion–Resistant Carbon Steel Flat Products from Korea*, 58 Fed.Reg. 44159 (Dep't Commerce 1993) [hereinafter "*Certain Steel Products from Korea*"]. In response to the August 31, 1995, request of petitioner AK Steel and respondents Dongbu, Union, and POSCO/POCOS/PSI, *Certain Steel Products from Korea*, 61 Fed.Reg. 51882, 51883 (Dep't Commerce 1996) (preliminary results of antidumping administrative review) [hereinafter "*Preliminary Results*"], Commerce initiated an administrative review of the antidumping duty orders for the period from August 1, 1994, through July 31, 1995, *Certain Steel Products from Korea*, 60 Fed.Reg. 46817 (Dep't Commerce 1995) (notice of initiation of administrative review). This review involves four producer-exporters: POSCO, POCOS, Union, and Dongbu.[2]

**1.** Domestic Producers raised no claims regarding PSI.

**2.** The distinctness of POSCO and POCOS, as applied to many of Commerce's determinations, is contested by AK Steel because POSCO owns fifty percent of POCOS. POCOS, POSCO, and

## Jurisdiction

■ The court has jurisdiction to review the final results of an antidumping duty administrative review pursuant to 19 U.S.C. § 1516a(a)(1)(D) (1994).

## Standard of Review

■ The court upholds the final results of an antidumping duty administrative review unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994).

■ In questions of statutory interpretation, the court determines first whether Congress has spoken directly to the precise question at issue. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where a statute is clear and on point, the court gives direct effect to Congress' intent, but where a statute is silent or ambiguous, the court defers to an agency's reasonable interpretation of its statutory mandate. *Id.* at 842–43, 104 S.Ct. 2778.

## I. EP v. CEP Classification

### Background

■ In its administrative review, Commerce classified all U.S. sales of subject merchandise as Export Price ("EP") sales, pursuant to 19 U.S.C. § 1677a(a) (1994). *Final Results,* 62 Fed.Reg. at 18434. Commerce based this decision on an application of the three-part test developed in *PQ Corp. v. United States,* 11 CIT 53, 63–65, 652 F.Supp. 724, 733–35 (1987). This test requires EP (formerly known as "purchase price" ("PP")) classification of sales made prior to import and through affiliated entities in the U.S. where the following criteria are satisfied:

(1) The subject merchandise was shipped directly from the manufacturer to the unrelated buyer, without being intro-

PSI have submitted a joint brief in support of their positions. For clarity, the court uses the distinction to describe the sales processes associated with these various producers and exporters of subject merchandise.

duced into the inventory of the related shipping agent;

(2) direct shipment from the manufacturer to the unrelated buyer was the customary channel for sales of this merchandise between the parties involved; and

(3) the related selling agent in the United States acted only as a processor of sales-related documentation and a communication link with the unrelated U.S. buyer.

*Final Results,* 62 Fed.Reg. at 18423 [hereinafter "*P.Q.* test"]. Where all elements of the test are satisfied, Commerce "consider[s] the exporter's selling functions to have been relocated geographically from the country of exportation to the United States, where the sales agent performs them." *Id.*

Domestic Producers dispute Commerce's use of the *P.Q.* test at all, arguing that Congress intended, through the EP and Constructed Export Price ("CEP") provisions, 19 U.S.C. §§ 1677a(a, b) (1994), that Commerce classify as CEP sales transactions which have associated U.S. indirect selling expenses. Thus, Domestic Producers request a remand on this issue. Defendant and Foreign Producers contend that Commerce's use of the *P.Q.* test is in accordance with law and should be affirmed.

Domestic Producers further dispute Commerce's specific application of the *P.Q.* test to these facts, contending that Commerce's classification of U.S. sales by the Foreign Producers as EP sales is not supported by substantial evidence. Specifically, they claim that each Foreign Producer's U.S. affiliate performs services beyond the mere document processing and information conduit functions described by the *P.Q.* test's third prong. Defendant requests a remand to reconsider its classification of the sales as EP because Commerce allegedly did not consider all record evidence. Foreign Producers oppose a remand. The facts individually relevant to POCOS, POSCO, Union, and Dongbu are discussed separately, in that order.

**POCOS**

To meet a U.S. production order, producer-exporter POCOS first sells subject merchandise to an affiliated Korean trading company, XYI,[3] which takes title. *POSCO's Section A Questionnaire Response* (Oct. 17, 1995), at A–25, C.R. Doc. 3, Pl.'s App., Tab 1, at 14. XYI resells the merchandise to another POCOS affiliate, XYA,[4] located in the United States, *id.,* which takes title and acts as importer of record, *Letter from POSCO to Commerce* (Feb. 27, 1996), at 24, C.R. Doc. 41, Pl.'s App., Tab 9, at 2 ("*POSCO's Letter*"). XYA then resells the merchandise to the unaffiliated customer. *POSCO's Section A Questionnaire Response,* at A–25, Pl.'s App., Tab 1, at 14.

The essential terms of sale are established prior to exportation of subject merchandise from Korea. Customers contact XYA and negotiate the preliminary terms of sale. *POSCO's Letter,* Ex.8, at 9, Pl's App., Tab 9, at 8. There are no published price lists for POCOS' products. *POSCO's Section A Questionnaire Response,* at A–47, Pl.'s App, Tab 1, at 21. Instead, POCOS provides XYA with quarterly base and other price lists[5] to which XYA adds overhead and brokerage and handling fees to provide a price quotation. *Id.* at A–41, A–47. XYA transmits the price quotation to POCOS for confirmation. *POSCO's Letter,* Ex.8, at 9, Pl's App., Tab 9, at 8. Upon receipt of POCOS' confirmation, XYA issues a sales contract to the customer. *POSCO's Section A Questionnaire Response,* at A–41, Pl.'s App., Tab 1, at 18.

In addition, XYA arranges and pays for marine insurance, U.S. transportation, U.S. customs clearance, and brokerage and handling services for individual shipments of subject merchandise. *Id.,* at A–33, Pl.'s App., Tab 1, at 17. XYA collects payment directly from the customers. *POSCO's Letter,* at 24, Pl.'s App., Tab. 9, at 2.

Domestic Producers contend that XYA has wide latitude in setting price and that POCOS does not exercise control when it confirms XYA's price, but rather simply "rubber stamps" the sale. This sharply contrasts

---

3. "XYI" is a fictitious name for [ ].

4. "XYA" is a fictitious name for [ ].

5. These are, specifically, lists of [ ] prices.

with Commerce's characterization of the relation—placing control over the sale fully with POCOS—implicit in its decision to classify these as EP sales. Specifically, Commerce explained that

> the selling functions of [XYA] ... are of a kind that would normally be undertaken by the exporter in connection with these sales. The role of [XYA] ... in the payment of cash deposits of antidumping and countervailing duties, their arrangement of certain movement-related expenses, their involvement in contracts with customers and commissionaires and in activities related to customer payment, are consistent with EP classification and are a relocation of routine selling functions from Korea to the United States.

*Final Results,* 62 Fed.Reg. at 18433.

### POSCO

Producer-exporter POSCO first sells subject merchandise destined for the United States to ABI,[6] a trading company wholly owned by POSCO, which takes title to the merchandise. *POSCO's Letter,* at 29, Pl.'s App., Tab 9, at 3. ABI resells the merchandise to ABA,[7] also wholly owned by POSCO, located in the United States. *Id.* ABA takes title to the merchandise, and acts as importer of record. *Id.,* at 29–30, Pl.'s App., Tab 9, at 3–4. ABA resells the merchandise to the unaffiliated customer. *POSCO's Home Market Verification Report* (Sept. 18, 1996), Ex. 24, at 54, C.R. Doc. 170, Pl.'s App., Tab 29, at 9.

The terms of sale are established prior to export to the United States. U.S. customers submit purchases orders to ABA with a price per unit stated on the order. *Id.* at 20, Pl.'s App., Tab. 29, at 7. Then the order is submitted to POSCO in Korea for confirmation, after which ABA issues the invoice to the customer. *POSCO's Letter,* at 29–30, Pl.'s App., Tab 9, at 3–4, *POSCO's Home Market Verification Report,* at 78, Pl.'s App., Tab 29, at 9. ABA arranges and pays for services such as U.S. inland transportation, U.S. cus-

toms clearance, and brokerage and handling for individual shipments of subject merchandise. *POSCO's Letter,* at 29–30, Pl.'s App., Tab 9, at 3–4. In addition, ABA collects payment from customers. *Id.,* at 29, Pl.'s App., Tab 9, at 3.

Domestic Producers requested that POSCO's U.S. sales be classified as CEP sales. *Domestic Producers' POSCO Case Brief* (March 5, 1997), at 5, C.R. Doc. 226, Pl.'s App., Tab 33, at 2. Commerce classified them, however, as EP sales. *Final Results,* 62 Fed.Reg. at 18433.

### Union

Producer-exporter Union sells to its U.S. affiliate, Union America, which takes title, *Union's Section A Questionnaire Response* (Oct. 20, 1995), at 16, C.R. Doc. 5. Pl.'s App., Tab 3, at 4, and acts as importer of record, *Union's CORR Letter* (Feb. 29, 1996), Ex. C–20, at 1, C.R. Doc. 44, Pl.'s App., Tab 14, at 24. Union America resells the merchandise to the unaffiliated customer in the United States. *See Union's Home Market Sales Verification Report* (Aug. 21, 1996), at Ex. 74, at 3, C.R. Doc. 137, Pl.'s App., Tab 20, at 11.

Customers have initial contact with [8] Union America, *see, e.g., Union's Home Market Sales Verification Report,* at Ex. 71, at 5, Pl.'s App., Tab 20, at 8, which negotiates the initial price with the customer based on certain factors [9] established by Union, *Union's Section A Questionnaire Response,* at 20, Pl.'s App., Tab 3, at 5. The purchase order is sent to Union for confirmation, *Union's Section A Questionnaire Response,* at 12, Pl.'s App., Tab 3, at 2, after which Union America invoices the sale to its U.S. customer, *Letter from Union to Commerce* (Nov. 27, 1995), Ex. C–6, at 1, C.R. Doc. 14, Pl.'s App., Tab 7, at 9 [hereinafter *"Union's CORR Section A (or C) Questionnaire Response,"*], and Union fills the order, *see Union's Section A Questionnaire Response,* at 12, Pl.'s App., Tab 3, at 2.

---

6. "ABI" is a fictitious name for [ ].

7. "ABA" is a fictitious name for [ ].

8. Customers [ ] Union America.

9. Union America negotiates the initial price with the customer based on [ ] established by Union.

Union America performs market research and economic planning, *Union's CR Letter* (Feb. 29, 1996), at 56, C.R. Doc. 44, Pl.'s App., Tab 13, at 3, sometimes taking steps [10] to find customers, *Union's CORR Section A Questionnaire Response*, Ex. C6, at 1, Pl.'s App., Tab 7, at 9. Union America also arranges and pays for post-sale warehousing, *Union's Section A Questionnaire Response*, at 12, n. 6, Pl.'s App., Tab 3, at 2, U.S. transportation, *Union's CORR Section C Questionnaire Response*, at 25, Pl.'s App., Tab 7, at 2, regular U.S. customs duties, brokerage and handling, and other expenses,[11] *Union's CR Letter* at Ex. C–9, C–10, Pl.'s App., Tab 13, at 7, 16; *Union's CORR Letter*, Ex. C–16, C–20, Pl.'s App., Tab 14, at 6, 23. In addition, Union America extends credit to U.S. customers, *Union's CR Questionnaire Response* (Nov. 27, 1995), at 29, C.R. Doc. 12, Pl.'s App., Tab 5, at 2, and maintains relationships with them, *Union's U.S. Sales Verification Report*, at 8, C.R. Doc. 135, Pl.'s App., Tab 19, at 4.

During the administrative review, Domestic Producers requested that Union's U.S. sales be classified as CEP sales. Commerce, however, classified them as EP sales. *Final Results*, 62 Fed.Reg. at 18439. Specifically, Commerce stated that

> [Union America's] selling functions are of a kind that would normally be undertaken by the exporter in connection with these sales. More specifically, we regard selling functions, rather than selling prices, as the basis for classifying sales as EP or CEP.... In this case, Union has transferred these routine selling functions to its related selling agent in the United States and the substance of the transaction is unchanged.

*Id.*

### Dongbu

Producer-exporter Dongbu sells subject merchandise destined for the United States to an affiliated Korean trading company, Dongbu Corporation, which takes title to the merchandise. *Dongbu's Section A Questionnaire Response* (Oct. 17, 1995), at 12, C.R. Doc. 4, Pl.'s App., Tab 2, at 2. Dongbu Corporation then resells the merchandise to another Dongbu affiliate located in the United States, Dongbu USA, which takes title to the merchandise, and acts as importer of record. *Id.* at 14, Pl.'s App., Tab 2, at 3; *Dongbu's Section B and C Questionnaire Response* (Nov. 27, 1995), at 101, C.R. Doc. 11, Pl.'s App., Tab 4, at 5. Dongbu USA then completes the transaction.[12] *Letter from Dongbu to Commerce* (Feb. 29, 1996), at Ex. A–24, at 4, C.R. Doc. 45, Pl.'s App., Tab 15, at 9 ("*Dongbu's Letter*").

Essential terms of sale of subject merchandise from Korea are established prior to export. *Dongbu's Section A Questionnaire Response*, at 12, Pl.'s App., Tab 2, at 2. Customers contact Dongbu USA and submit purchase orders.[13] *Dongbu's Letter*, at Ex. A–24, at 3, Pl.'s App., Tab 15, at 8. Dongbu USA communicates further with Dongbu.[14] *Dongbu's Section A Questionnaire Response*, at Ex. A–8, Pl.'s App., Tab 2, at 15. Once confirmation is received, Dongbu USA issues the sales contract. *Id.*, at Ex. A–8, A–9, Pl.'s App., Tab 2, at 15, 18. In addition, Dongbu USA pays for various services,[15] and arranges and pays for additional services.[16] *Id.*, at 14, Pl.'s App., Tab 2, at 3. Dongbu USA also extends credit to customers, *Dongbu's Section B and C Questionnaire Response*, at 90, Pl.'s App., Tab 4, at 3, and handles all billing and accounting functions relating to U.S. sales, *Dongbu's Section A Questionnaire Response*, at Ex. A–8, Pl.'s App., Tab 2, at 15.

Domestic Producers requested that Dongbu's U.S. sales be classified as CEP sales. *Domestic Producers' Dongbu Case Brief* (Dec. 2, 1996), at 4, P.R. Doc. 415, Def.'s

---

10. Union America sometimes [ ] to find customers.

11. Union America arranges and pays for [ ].

12. Dongbu USA [ ].

13. The purchase orders [ ].

14. Dongbu USA [ ].

15. Dongbu USA pays for [ ].

16. Dongbu USA arranges and pays for [ ].

App., Ex. 5, at 3. Commerce, however, classified Dongbu USA's U.S. sales as EP sales. *Final Results,* 62 Fed.Reg. at 18423. Specifically, Commerce stated that

> Dongbu USA's selling functions are of a kind that would normally be undertaken by the exporter in connection with these sales. Dongbu USA's role in the payment of cash deposits of antidumping and countervailing duties, extension of credit to U.S. customers, the processing of certain warranty claims, and project development are consistent with EP classification and are a relocation of routine selling functions from Korea to the United States.

*Id.*

### Discussion

■ Having classified the U.S. sales at issue as EP sales, Commerce now asserts that it failed to consider all evidence of record and desires a remand to reconsider the classification in light of this error. The court finds this position disingenuous. The documents cited by Government counsel at oral argument have been central to the proceeding. Further, they do not detract from the substantial evidence which supported Commerce's original determination. Commerce had ample time before oral argument to establish error warranting remand. It did not do so. Nor have the domestic producers established error.

The three-part *P.Q.* test has been accepted by the court, *see Mitsubishi v. United States,* 15 F.Supp.2d 807, 813–14 (C.I.T.1998), and its use here did not contradict the statute. The test is simply a means to determine whether the sale at issue for antidumping duty purposes is in essence between the exporter/producer and the unaffiliated buyer, in which case the EP rules apply, or whether the intermediate sale to the affiliate has sufficient substance that the CEP rules apply. There is no conflict between the words of 19 U.S.C. §§ 1677a(a)-(b) and the *P.Q.* test. The focus here is on the third prong of the test: whether the sales agent is more than a communication link and a paper processor.

As indicated in *U.S. Steel Group — A Unit of USX Corp. v. United States,* 15 F.Supp.2d 892, 903 (C.I.T.1998), at the time Commerce made the determination at issue, the distinctions drawn under the third prong of the *P.Q.* test were extremely subtle. Nonetheless, there was nothing of record indicating clearly that the sales agents at issue here took steps beyond those still found acceptable for EP (formerly PP) classification purposes in many cases. *See e.g. Outokumpu Copper Rolled Products AB v. United States,* 17 CIT 848, 858–59, 829 F.Supp. 1371, 1379–80 (1993) (PP classification sustained where U.S. affiliate took title to merchandise and paid warehousing fees related to "just in time" delivery), *remand results affirmed,* 18 CIT 204, 850 F.Supp. 16 (1994); *E.I. DuPont de Nemours & Co. v. United States,* 17 CIT 1266, 1281–82, 841 F.Supp. 1237, 1249–50 (1993) (PP classification sustained where U.S. affiliate received purchase orders and payments from, and sent invoices to, customers and acted as importer of record); *Zenith Electronics Corp. v. United States,* 18 CIT 870, 874 (1994) (PP classification sustained where customary sales channel was direct shipment from producer to unaffiliated customer and U.S. affiliate did not introduce merchandise into inventory); *Independent Radionic Workers of America v. United States,* 19 CIT 375, 375 (1995) (PP classification sustained where U.S. affiliate "processed purchase orders, performed invoicing, collected payments, arranged U.S. transportation and was the importer of record").

Nothing in the record clearly indicates that the sales agents here were free to negotiate prices as were the agents in *U.S. Steel,* 15 F.Supp.2d at 901. While before the final determination Commerce may have been free to assess the evidence differently than it did, it was not error to classify the sales at issue as EP sales. The court suggests that Commerce devise some clearer standards for EP/CEP decision-making, but those standards cannot be applied in a case such as this, where the standards applied were acceptable at the time applied and where substantial evidence existed for the decision made.

### II. Collapsing the POSCO Group and Application of the Fair Value and Major Input Provisions to Substrate Transfers Between POSCO Group Members

#### Background

Commerce collapsed POSCO, POCOS, and PSI into the POSCO Group for its dumping

analysis and levied a single antidumping duty on the entire group. *Final Results,* 62 Fed. Reg. at 18430. POSCO supplies POCOS and PSI with various types of rolled coil substrate, the major input to the subject merchandise these companies sell in the U.S. *Letter from POSCO to Commerce* (April 12, 1996), at 26, C.R. Doc. 66, Def.'s Conf.App., Ex. 6, at 3. In its *Preliminary Results,* 61 Fed.Reg. at 51887, Commerce applied 19 U.S.C. §§ 1677b(f)(2)-(3) (1994), the fair value [17] and major input [18] provisions, to calculate substrate costs for the POSCO group. This method required Commerce to treat each member of the collapsed POSCO group as an individual entity for the purpose of calculating substrate costs. 19 U.S.C. § 1677b(f)(2)-(3). Commerce used the transfer price POSCO charged to POCOS and PSI as the substrate value in its EP calculations. *Preliminary Results,* 61 Fed.Reg. at 51887.

POSCO challenged this before Commerce, arguing that if Commerce were to levy a single antidumping duty upon the entire POSCO Group, it would be inconsistent to calculate substrate costs by separating the affiliated entities. *POSCO's Response to Petitioner's Comments* (Sept. 25, 1996), at 19, P.R. Doc. 367, Def.App., Ex. 14, at 2. Domestic Producers countered that POSCO, POCOS, and PSI meet the definition of affiliates in 19 U.S.C. § 1677(33) (1994), so the fair value and major input provisions should apply. *Petitioners' Rebuttal Brief before Com-merce* (Dec. 9, 1996), at 2, P.R. Doc. 421, Def.'s App., Ex. 16, at 2. While collapsing the POSCO Group might be appropriate for levying the antidumping duty, they argued, such intimate affiliation does not elide corporate boundaries for purposes of calculating substrate costs. *Id.,* at 5, Def.'s App., Ex. 16, at 5.

Commerce agreed with POSCO that collapsing the POSCO Group required Commerce to consider the substrate sales as between different parts of a single entity, not as between separate affiliated entities, so 19 U.S.C. §§ 1677b(f)(2)-(3) would not apply. *Final Results,* 62 Fed.Reg. at 18430. Commerce revised its calculation accordingly. *Id.* at 18,431. Domestic Producers here contend that Commerce erred in that revision.

### Discussion

■ Domestic Producers contend that Commerce erred when it collapsed POSCO, POCOS, and PSI into the POSCO Group for sales and costs purposes and calculated a single antidumping margin. Domestic Producers argue that because POSCO owns fifty percent of POCOS, POSCO and POCOS are "affiliated persons" pursuant to 19 U.S.C. §§ 1677(33)(E)-(F) (1994).[19] They reason that Commerce is precluded from collapsing them, because the statute permits collapsing or affiliation, but not both.

---

17. The statute provides, in relevant part:

(2) Transactions disregarded

A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

19 U.S.C. §§ 1677b(f)(2).

18. The statute provides in relevant part:

(3) Major input rule

If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the mer-chandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

19 U.S.C. § 1677b(f)(3).

19. The statute provides, in relevant part:

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

19 U.S.C. §§ 1677(33)(E)-(F).

Commerce is directed to "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise." 19 U.S.C. § 1677f–1(c)(1) (1994). Through its collapsing practice, Commerce treats closely related companies as a single exporter or producer for purposes of the antidumping inquiry. The statute defines exporters and producers tautologically as

> the exporter of the subject merchandise, the producer of the subject merchandise, or both where appropriate. For purposes of section 1677b of this title, the term 'exporter or producer' includes both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise.

19 U.S.C. § 1677(28) (1994). The statute is silent as to what constitutes an individual exporter or producer. Where a statute is silent or ambiguous, the court defers to Commerce's reasonable interpretation of its stat-

utory mandate. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

Commerce's collapsing practice is long standing, *see e.g. Certain Fresh–Cut Flowers from Colombia*, 61 Fed.Reg. 42833, 42853 (Dep't Commerce 1996) (final results of antidumping administrative review); *Certain Carbon Steel Products from Japan*, 58 Fed. Reg. 37154, 37159 (Dep't Commerce 1993) (final determination), and has been affirmed by the court, *see Asociacion Colombiana de Exportadores de Flores v. United States*, 6 F.Supp.2d 865, 893 (C.I.T.1998); *see also Queen's Flowers de Colombia v. United States*, 981 F.Supp. 617, 622–23 (C.I.T. 1997).[20] As the court has not yet ruled on the issue of whether Commerce's collapsing practice survives the Uruguay Round Agreements Act ("URAA"),[21] Pub.L. No. 103–465, 108 Stat. 4809 (1994), the issue bears closer examination.[22]

The statute leaves Commerce the discretion to collapse. The definition of exporter or producer, 19 U.S.C. § 1677(28) permits Commerce to include the producer and exporter of the subject merchandise "to the extent necessary."[23] Under both the "fair

**20.** *Queen's Flowers* was decided under the prior version of the statute defining exporters, 19 U.S.C. § 1677(13) (1988), which was amended by Pub.L. 103–465 § 222(i)(1) in 1994. Minor changes to the language of the statute, however, do not affect the collapsing issue.

**21.** Post–URAA law applies to this case. The URAA amendments took effect January 1, 1995. Pub.L. No. 103–465 § 291, 108 Stat. at 4931. Commerce initiated its review of the antidumping duty order in *Certain Steel Products from Korea*, on September 8, 1995, 60 Fed.Reg. at 46817, and published its Final Results on April 15, 1997, 62 Fed.Reg. at 18405.

**22.** Commerce is under the impression that collapsing continues. In 1996, Commerce published proposed rules to incorporate the URAA amendments, which include a codification of collapsing. *Antidumping Duties; Countervailing Duties*, 61 Fed.Reg. 7308, 7330 (Dep't Commerce 1996). Under the heading, "Treatment of affiliated producers in antidumping proceedings," the proposed rules provide that

> the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant

> potential for the manipulation of price or production.

Proposed 19 CFR § 351.401(f); *Antidumping Duties; Countervailing Duties*, 61 Fed.Reg. at 7381. Note the use of the new statutory term, "affiliated persons," in conjunction with reference to collapsing. Thus, under certain conditions, Commerce "would treat related producers that were separate legal entities as a single entity.... Where firms were so collapsed, the Department would issue a single questionnaire to, and calculate a single weighted-average dumping margin for, the collapsed entity." *Id.* at 7330.

Subsection (1) of Commerce's final rule on collapsing retains the language of the proposed rule. 19 C.F.R. § 351.401(f)(1) (1997). Commerce explained that the "significant potential for price manipulation" language entails that "collapsing requires a finding of more than mere affiliation," but is not such a high standard that Commerce will only collapse in " 'extraordinary' circumstances." *Antidumping Duties; Countervailing Duties*, 62 Fed.Reg. 27296, 27345 (Dep't Commerce 1997).

**23.** The statute provides, in relevant part:

> ... the term "exporter or producer" includes both the exporter of the subject merchandise and the producer of the same subject merchandise *to the extent necessary* to accurately calcu-

value" and "major input" provisions, 19 U.S.C. §§ 1677b(f)(2)-(3), Commerce "may" disregard transactions between affiliated parties if they do not reflect market value, but does not appear to be required by the statute to do so.[24] Thus Commerce has the discretion to disregard transactions between affiliated parties where appropriate. Commerce has deemed the case of collapsed entities to be such an instance.

There is no explicit reference to collapsing in the legislative history. The legislative history reflects Congressional awareness of collapsing. With reference to the definition of exporter or producer in 19 U.S.C. § 1677(28), the Senate noted that where different firms perform the production and selling functions, Commerce *may* include the costs, expenses, and profits related to sales of subject merchandise of each firm, *consistent with Commerce's current practice*. S.Rep. No. 103–412, at 61 (1994) (emphasis added). The court finds Commerce's interpretation of the statute as continuing to permit collapsing to be reasonable.

Domestic Producers argue that even if Commerce could collapse the members of the POSCO Group, Commerce erred in not applying the fair value and major input provisions, 19 U.S.C. §§ 1677b(f)(2)-(3), to substrate transfers between POSCO Group companies, because these are mandatory provisions for affiliated companies, collapsed or not. Domestic Producers argue that POSCO and POCOS meet the definition of affiliated parties in 19 U.S.C. §§ 1677(33)(E)-(F), which make no reference to, or exception for, collapsed companies. The court affirms Commerce's determination that the provisions did not apply because, once collapsed, the POSCO Group was a single entity, not a group of "affiliated persons." *Final Results,* 62 Fed.Reg. at 18430–31.

While POSCO and POCOS, if considered separately, meet the definition of affiliated persons in 19 U.S.C. §§ 1677(33)(E)-(F), the fact that the fair value and major input provisions, 19 U.S.C. §§ 1677b(f)(2)-(3), do not refer to collapsed entities, and only to "affiliated persons," does not mean the statute requires application of these provisions to collapsed groups. The court finds, rather, that because the statute is silent about, and does not conflict with, Commerce's collapsing practice, Commerce is within its discretion in deciding to treat collapsed parties as no longer separate affiliates for purposes of 19 U.S.C. §§ 1677b(f)(2)-(3). *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778.

Commerce reasoned that 19 U.S.C. §§ 1677b(f)(2)-(3) did not apply because "a decision to treat affiliated parties as a single entity necessitates that transactions among the parties also be valued based on the group as a whole." *Final Results,* 62 Fed.Reg. at 18430. This is consistent with Commerce's practice of not applying the fair value and major input provisions to transfers of substrate between divisions of the same company. *Certain Forged Steel Crankshafts from the United Kingdom,* 61 Fed.Reg. 54613, 54614 (Dep't Commerce 1996) (final results of antidumping duty administrative review). Commerce did apply the provisions to substrate transfers between partially collapsed companies in *Large Newspaper Printing Presses from Germany,* 61 Fed.Reg. 38166, 38187–88 (Dep't Commerce 1996) (final de-

---

late the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise.
19 U.S.C. § 1677(28) (emphasis added).

**24.** The "fair value" provision states, in relevant part:
 (2) Transactions disregarded.
 A transaction directly or indirectly between affiliated persons *may be disregarded* if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration.

19 U.S.C. § 1677b(f)(2) (emphasis added). The "major input" provision states, in relevant part:
 (3) Major input rule.
 If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority *may determine* the value of the major input on the basis of the information available. . . .
19 U.S.C. § 1677b(f)(3) (emphasis added).

termination), but there the companies manufactured different equipment models and were collapsed for cost purposes for selected items only, but not for all purposes, 61 Fed. Reg. at 38188, as in this case.

As the agency notes this review marks a change in Commerce's collapsing practice. *Final Results*, 62 Fed.Reg. at 18430–31 ("We find that our prior practice of collapsing entities while continuing to apply the fair-value provision and the major-input rule is improper."). As of the administrative decision reviewed in *FAG [U.K.], Ltd. v. United States*, 24 F.Supp.2d 297 (C.I.T.1998), Commerce had not fully considered whether collapsed companies should be regarded as a single entity or as related parties. Whether or not Commerce's treatment of collapsed companies as related parties for purposes of calculating constructed value was permissible under the old statute and accorded with pre-URAA administrative practice, as found in *FAG (U.K.)*, 24 F.Supp.2d 297, 302–03, the court now recognizes Commerce's revised interpretation and changed practice as not only permissible but preferable as a more logical, integrated application of the statute. *See Chevron*, 467 U.S. at 863, 104 S.Ct. 2778 (initial agency interpretation not "carved in stone"); *see also* David M. Gossett, Comment, *Chevron, Take Two: Deference to Revised Agency Interpretations of Statutes*, 64 U. Chi. L.Rev. 681, 682 (1997) (courts equally deferential to revised agency statutory interpretations).

Commerce determined that POSCO, POCOS, and PSI represent one producer of subject merchandise and collapsed them into a single entity, the POSCO Group, for both sales and costs purposes. Once collapsed, the POSCO Group was treated as a single entity, not a set of affiliated persons. Commerce reasonably determined that it should act consistently with its collapsing determination and not apply inconsistent solitary provisions, thereby arbitrarily increasing respondents' liability. Therefore, the court sustains Commerce's decision not to apply the fair value and major input provisions to these entities which were collapsed for all relevant purposes.

## III. Affiliation of POSCO with Union or Dongbu

### Background

POSCO and Union's parent company, DSM, own 50 and 49.99 percent of their joint venture, POCOS, respectively. *POSCO's Section A Questionnaire Response*, at 17, Def.'s App., Tab 1, at 11. Commerce determined that POSCO and Union were not affiliated through "their respective affiliations with DSM." *Final Results*, 62 Fed.Reg. at 18417. Commerce concluded that because neither POSCO nor Union owns, controls, or holds with power to vote, 5 percent or more of the other's outstanding stock or shares, they cannot be deemed affiliated pursuant to 19 U.S.C. § 1677(33)(E). *Final Results*, 62 Fed.Reg. at 18417. Commerce also determined that POSCO and Union are not affiliated pursuant to 19 U.S.C. § 1677(33)(F), because the evidence does not show that these companies constitute "(t)wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person." *Final Results*, 62 Fed.Reg. at 18417.

### A. Corporate Relationships

Domestic Producers argued before Commerce that if Commerce collapsed POSCO and POCOS into a single entity, then it should also collapse DSM and Union. POSCO and Union would then be affiliated through POSCO's and DSM's joint venture in POCOS. The Domestic Producers claimed that Union's and POCOS' common use of XYA as their sales affiliate in the U.S. underscores POSCO's affiliation with Union. *Letter from AK Steel to Commerce* (Feb. 27, 1997), at 82, 99–100, 102, 106, 108, C.R. Doc. 224, Pl.'s App., Tab 32, at 2–8. Commerce disagreed, explaining that

[s]ubsection (F)'s affiliation standard is met where two parties control a third party, as here. But such a finding of affiliation does not mean that the two affiliated parties control one another. The alleged link between POSCO and Union is even more tenuous. Because POSCO does not control DSM, Union's parent company, DSM is not a vehicle through which POSCO can indirectly control Union, DSM's

subsidiary. In other words, POSCO affiliation with DSM and DSM control of Union do not add up to POSCO control of Union. *Final Results*, 62 Fed.Reg. at 18417–18. Commerce concluded that no record evidence showed either Union or POSCO to be "in a position to control, either legally or operationally, the other party," as provided by 19 U.S.C. § 1677(33)(G). *Id.* at 18418.

## B. Supplier Reliance

Domestic Producers also sought to ground an affiliation between POSCO and Union and one between POSCO and Dongbu on Union's and Dongbu's alleged common reliance on POSCO as their main supplier of hot-rolled coil, the principal input material for the subject merchandise. During the period of review, POSCO supplied a large percentage,[25] by volume, and a large percentage,[26] by value, of all hot-rolled coil consumed by Dongbu, *Dongbu's Letter*, at 7, Pl.'s App., Tab 15, at 2, and a large percentage,[27] by volume, and a large percentage,[28] by value, of all hot-rolled coil consumed by Union, *Union's CR Letter*, Pl.'s App., Tab 13, at 2. In addition, Union and Dongbu purchased hot-rolled coil from POSCO even though import prices were lower for 15 out of 23 quarters from 1991 through the third quarter of 1996. *Final Results*, 62 Fed.Reg. at 18417.

Commerce rejected Domestic Producers' claim that POSCO sold to Union and Dongbu at below its cost of production because Domestic Producers' estimation of costs were based on all possible types of hot-rolled coil, not the specific products sold to Union and Dongbu. *Id.* While the average estimated cost of production for all types of hot-rolled coil might be higher than POSCO's prices to Union and Dongbu, Commerce determined

that the actual production costs of hot-rolled coil sold to Union and Dongbu were below the sales price. *Id.* Finally, Commerce determined that POSCO, Union, and Dongbu all compete in the U.S. market for sales of finished products. *Commerce's Memo to File* (Aug. 28, 1996), at 2, C.R. Doc. 143, Dongbu's App., Tab 5, at 1.

Commerce noted that a finding of affiliation is unwarranted unless "a situation exists where the buyer has, in fact, become reliant on the seller, or vice versa." *Final Results*, 62 Fed.Reg. at 18417. Moreover, "[t]he record shows that Dongbu and Union have alternate sources of supply for [hot rolled coil], that they can and do purchase significant quantities of [hot rolled coil] from abroad." *Id.* Thus, Commerce determined that POSCO was not affiliated with either Union or Dongbu based on their supplier relationships. *Id.*

## Discussion

## A. Corporate Relationships

■ Domestic Producers here again contend that if Commerce may collapse the POSCO Group and treat it as a single entity, it must also find DSM to be affiliated with the POSCO Group, pursuant to 19 U.S.C. § 1677(33)(E), through DSM's fifty percent ownership of POCOS,[29] and thus to be affiliated with POSCO as a member of the POSCO Group. They likewise argue that from DSM's alleged affiliation with Union, Commerce should have derived an affiliation between POSCO and Union, pursuant to 19 U.S.C. § 1677(33)(F).

Based on an analysis of POSCO and POCOS as separate entities, not as members of

25. [ ] percent

26. [ ] percent

27. [ ] percent

28. [ ] percent

29. The statute provides, in relevant part:
 The following persons shall be considered to be "affiliated" or "affiliated persons":

 (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5

percent or more of the outstanding voting stock or shares of an organization and such organization.
 (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.
19 U.S.C. §§ 1677(33).

a single collapsed entity, Commerce determined that neither Union nor DSM were affiliated with POSCO, pursuant to 19 U.S.C. §§ 1677(33)(E)-(F). Commerce may not analyze the relationship of members of the POSCO Group to the outside world as if they were independent once it has collapsed them. Commerce should have determined whether DSM, and thus Union, were affiliated with the entire POSCO Group based on DSM's percentage ownership and control of the POSCO Group through its fifty percent stake in POCOS. All parties agree that POSCO is an extremely large company relative to POCOS, and thus comprises the overwhelming proportion of assets in the POSCO Group. As a result, DSM's fifty percent stake in POCOS translates to an extremely small stake in the POSCO Group. When DSM's relationship to the POSCO Group is analyzed correctly, the only reasonable conclusion on these facts is that DSM has insufficient ownership or control over the POSCO Group to find affiliation pursuant to 19 U.S.C. §§ 1677(33)(E)-(F).

DSM is not "legally or operationally in a position to exercise restraint or direction over the [POSCO Group]," as required by 19 U.S.C. § 1677(33). Commerce already determined that POSCO and DSM are unable to restrain or direct the other's operations. *Final Results*, 62 Fed.Reg. at 18417. It follows that DSM and the POSCO Group cannot direct each other's operations, given that the POSCO Group is both larger and functionally more complex with the addition of POCOS and PSI than POSCO alone. Because DSM is not affiliated with the POSCO Group, Union is not either, as the argument for the latter affiliation depends upon the former. The court therefore sustains Commerce's determination that POSCO and Union are not affiliated through their corporate relationships.

## B. Supplier Reliance

■ Domestic Producers contend that POSCO and Union, and POSCO and Dongbu,

are affiliated pursuant to 19 U.S.C. § 1677(33)(G) based on POSCO's role as a major supplier of hot-rolled coil for Union and Dongbu. Domestic Producers argue that the statute requires no more than a determination that Dongbu and Union *may be* reliant on POSCO, rather than evidence of reliance in fact, as Commerce more narrowly interprets it.[30] Domestic Producers maintain that substantial record evidence supports a finding that POSCO's supplier relationship to Dongbu and Union puts POSCO in a position to exercise actual restraint over Dongbu and Union. As the court finds Commerce's interpretation permissible and its factual finding well supported, Commerce's determination is sustained.

Domestic Producers find evidence for their interpretation of the statute in the Statement of Administrative Action ("SAA"), which explains that "[a] company may be in a position to exercise restraint or direction, for example, through ... close supplier relationships." SAA at 838. Domestic Producers argue that if Congress had meant exclusive reliance, the drafters would not have used the apparently less stringent terms "close supplier relationship." *Id.* Domestic Producers, however, quote only selectively from the SAA, significantly omitting the end of the sentence containing that language.

> "A company may be in a position to exercise restraint or direction, for example, through ... close supplier relationships *in which the supplier or buyer becomes reliant upon the other.*"

SAA at 838 (emphasis added). The full sentence supports not the Domestic Producers' but rather Commerce's interpretation that a finding of reliance in fact must precede a determination that two parties are affiliated pursuant to 19 U.S.C. § 1677(33)(G). *Id.* Commerce's interpretation, that "control" in a supplier relationship pursuant to 19 U.S.C. § 1677(33)(G) is predicated on a finding that

---

**30.** The statute provides, in relevant part:
The following persons shall be considered to be "affiliated" or "affiliated persons":

. . . . .

(G) Any person who controls any other person and such other person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.
19 U.S.C. § 1677(33).

reliance between the parties exists in fact, is reasonable.

The court also finds Commerce's determination that Union and Dongbu were not in fact reliant on POSCO, and vice versa, to be supported by substantial evidence. As indicated, Union and Dongbu purchased large percentages,[31] by volume, or by value,[32] respectively, of their hot-rolled coil from POSCO. *Union's CR Letter,* Pl.'s App., Tab 13, at 2; *Dongbu's Letter,* at 7 Pl.'s App., Tab 15, at 2. Commerce has declined to find affiliation where a producer supplied 100 percent of its U.S. sales through a single, unrelated U.S. importer but where the parties are free to seek other business partners. *See Melamine Institutional Dinnerware Products from Indonesia,* 61 Fed.Reg. 43333, 43335 (Dep't Commerce 1996) (preliminary determination). That Dongbu and Union buy approximately twenty-five percent of their hot-rolled coil supply from other sources shows they are free to buy elsewhere.

Aware that Union and Dongbu continued to buy the majority of their hot-rolled coil from POSCO, despite usually lower import prices, Commerce noted that

> [t]he record indicates that POSCO has a comparative advantage over imported steel for reasons of proximity, cost, reliability of supply, and differences in specifications, grade, and quality, which can explain POSCO's position as principal supplier to Dongbu and Union.

*Final Results,* 62 Fed.Reg. 18417. Commerce also considered that the cost of production of hot-rolled coil sold to Union and Dongbu was not higher than the sale price. *Id.* Finally, Commerce reflected that POSCO, Union, and Dongbu all compete in the U.S. market for sales of finished products. *Commerce's Memo to File,* at 2, Dongbu's App., Tab 15, at 2. The court finds that Commerce based its determination on this substantial record evidence that Dongbu and Union are not reliant in fact on POSCO for their hotrolled coil supply. The court therefore sustains Commerce's determination that

POSCO is affiliated with neither Union nor Dongbu based on a supplier relationship.

## IV. Markups

### Background

#### Dongbu USA

To export subject merchandise to the U.S., Dongbu employs an affiliated broker, Dongbu Express, that arranges for over-land transportation from the production site to the shipping port in Korea. *Dongbu's Section A Questionnaire Response,* at 24, Pl.'s App., Tab 2, at 8. Commerce deducted the markups Dongbu paid to Dongbu Express in its EP calculation. *Final Results,* 62 Fed. Reg. at 18427.

Domestic Producers argued before Commerce that Dongbu USA's entire markup, which includes movement expenses, sales-related expenses, and profit, likewise should be deducted in Dongbu's EP calculation because Dongbu USA's transactions with Dongbu are identical in substance to those between Dongbu and Dongbu Express. *Id.* at 18425. Commerce determined, however, that Dongbu's transactions with Dongbu USA were different from those with Dongbu Express because Dongbu USA hired an outside broker to handle import services. *Id.* Furthermore, Commerce determined that

> the costs of arranging for U.S. brokerage and handling, U.S. customs clearance, and, as the importer of record, the payment of customs duties, are reflected in the brokerage fees paid by Dongbu USA and are accounted for on a sale-by-sale basis in [Dongbu USA's financial records].

*Id.* Commerce concluded from this that deducting any additional fees charged by Dongbu USA was not required to accurately calculate EP. *Id.* Domestic Producers challenge this decision.

#### Union America

For its corrosion-resistant sales, Union reported "barging, inspection fees, entry fees, and handling charges incurred in the United States" in its financial records. *Union's Sec-*

---

**31.** Union and Dongbu purchased [ ] percent and [ ] percent, by volume, of their hot-rolled coil from POSCO, respectively.

**32.** Union and Dongbu purchased [ ] percent and [ ] percent, by value, of their hot-rolled coil from POSCO, respectively.

*tion B and C Questionnaire Responses*, at C–27, P.R. Doc. 81, Def.'s App., Ex. 29, 4. Commerce deducted these expenditures from Union's EP as a component of aggregated U.S. movement expenses. *Preliminary Results*, 61 Fed.Reg. at 51885–86.

Domestic Producers argued before Commerce that, in addition to the movement charges already reported, the portion of Union America's markup attributable to the provision of movement-related services should be deducted from Union's price in the United States. *Petitioners' Union Case Brief* (Dec. 2, 1996), at 16, P.R. Doc. 414, Def.'s App., Ex. 11, at 5. Specifically, they argued that any amount charged by Union America exceeding its reported U.S. movement expenses (1) represents "charges incurred in bringing the merchandise from the place of shipment to the unaffiliated U.S. customer" and (2) reflects "additional services that would have been sustained by Union in the absence of [Union America]." *Id.*, at 17–18, Def.'s App., Ex. 11, at 6–7. Domestic Producers also suggested that, because the services provided by Union America were identical in substance to those provided by Dongbu Express, and because no record information permits Commerce to ascertain precisely what portion of Union America's markup can be linked to the movement of the subject merchandise, Commerce should employ the record data for Dongbu Express as a proxy for the markups charged by Union America. *Id.* at 20–21. Domestic Producers maintain that "[t]he resulting amount should be deducted from U.S. price, along with other previously-reported movement charges."

Commerce disagreed and concluded, as it had for Dongbu USA, that

> [Union America] does not directly perform ... U.S. brokerage and handling services for Union but rather employs customs brokers to carry out such services, to facilitate customs clearance, and to pay any customs duties. We verified that all U.S. brokerage and handling expenses (i.e., demurrage and wharfage charges) incurred by [Union America] on behalf of Union were fully reported on a sale-by-sale basis.

*Final Results*, 62 Fed.Reg. at 18441. Domestic Producers challenge this decision.

## Discussion

■ Domestic Producers claim that Commerce erred by not considering the movement services provided by Dongbu USA and Union America as parallel to that of Dongbu Express. They repeat their contention that Commerce should have used Dongbu Express' markup as a proxy to establish the markup percentage attributable to Dongbu USA's and Union America's movement expenses. Instead, Commerce deducted from EP the fees Dongbu USA and Union America paid to unaffiliated brokers for services such as customs clearance and handling, pursuant to 19 U.S.C. § 1677a(c)(2)(A) (1994). *Final Results*, 62 Fed.Reg. at 18425, 18441. The court rejects Domestic Producers' analogy and sustains Commerce's determination that the brokerage fees accounted for all costs incident to bringing the subject merchandise from the original place of shipment in Korea to the United States and that further deductions from Dongbu USA's and Union America's markups for movement costs were not required.

Commerce's standard practice is to define movement expenses under 19 U.S.C. § 1677a(c)(2)(A) as the cost of a "market transaction" between unrelated parties. *See High Information Content Flat Panel Displays and Display Glass Therefor from Japan*, 56 Fed.Reg. 32376, 32393 (Dep't Commerce 1991) (final determination) ["*Flat Displays from Japan* "] (deduction of markup charged by affiliated companies for U.S. movement expenses from purchase price sales legitimate because markups "were equivalent to prices based upon market transactions"); *see also Toyota Motor Sales, Inc., v. United States*, 17 CIT 841, 846–47, 829 F.Supp. 1364, 1369 (1993) (Commerce's deduction of importer's entire markup from purchase price affirmed because the markup was equivalent to "the actual expenses relating to the movement of subject imports that [the importer] would have incurred regardless of the relationship of the party performing the service"). As the statute [33]

---

**33.** In 1994, Public Law 103–465 § 223 amended

19 U.S.C. § 1677a(d)(2)(A) (1988). The amend-

does not prescribe a method for Commerce to determine the markup proportion attributable to movement expenses, 19 U.S.C. § 1677a(c)(2)(A), the court defers to Commerce's reasonable interpretation of its mandate. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. Commerce's understanding that movement expenses are completely captured by the market price of movement services is reasonable.

Commerce's approach to determining Dongbu USA's and Union America's movement expenses was consistent with its approach to Dongbu Express, even though the outcome differed. Dongbu Express' sole function is freight forwarding, so its markup reflects only movement expenses. Because Commerce concluded that Dongbu affiliate Dongbu Express' entire markup was equivalent to the commercially reasonably rates an unaffiliated freight forwarder would have charged, it deducted the entire amount. *Final Results,* 62 Fed.Reg. at 18427.

Unlike Dongbu Express, Dongbu USA and Union America perform sales-related document processing. Moreover, Dongbu USA and Union America themselves do not directly perform movement-related services. Instead, they hire non-affiliated brokers to perform brokerage and handling services. Because Dongbu USA and Union America are involved in both sales and movement functions, Commerce had to determine the markup portion attributable to movement expenses. Commerce reasonably concluded that the brokerage charges captured all movement expenses. When Dongbu USA and Union America hired unaffiliated brokers, they paid the market rate for their services, so Commerce did not need to make a market comparison, as it had made for Dongbu Express, to determine what portion of the markup reflected commercially reasonable rates.

Domestic Producers' suggest that Commerce use Dongbu Express as a proxy to determine the movement expense portion of Dongbu USA's and Union America's markups, as it did in the case of POSCO's and POCOS' U.S. affiliates. Domestic Producers argue that all four U.S. affiliates provide identical services to their Korean counterparts and should be treated analogously. The analogy is false, leading to a senseless result. POSCO's and POCOS' U.S. affiliates perform brokerage services in addition to sales-related document processing. As with Dongbu USA and Union America, Commerce had to determine what portion of their markup was attributable to movement expenses. Unlike Dongbu USA and Union America, however, POSCO's and POCOS' U.S. affiliates perform the brokerage and handling services themselves. Commerce, therefore, could not define their market rate movement expenses according to brokerage fees, because none existed. Instead, Commerce used Dongbu Express' markup as a proxy to determine the movement expense portion of POCOS' and POSCO's U.S. affiliates' markups that approximated its normal practice of defining movement expenses by market transactions. *See Flat Displays from Japan,* 56 Fed.Reg. at 32393. Commerce did not face the same problem with Dongbu USA's and Union America's markups because they hired outside brokers to perform movement-related services. Thus, Commerce defined their movement expenses by their brokerage fees. To use the Dongbu Express markup to gauge the movement expenses of Dongbu USA and Union America, would be to substitute unnecessarily for an actual market transaction a proxy which is itself acceptable only because it approximates one. This could not possibly produce a more accurate determination. Thus the court affirms Commerce's movement expense determination for Dongbu USA and Union America.

## V. POSCO's Cost Reconciliation

### Background

Commerce provided a cost of production and constructed value verification agenda to

---

ment changed the language from

... import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States,

19 U.S.C. § 1677a(d)(2)(A) (1988), to

... import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States,

19 U.S.C. § 1677a(c)(2)(A) (1994). The change does not affect the outcome of this case.

POSCO which outlined the information it needed to check whether costs reported in POSCO's financial statements reconciled to its cost accounting system and reported manufacturing costs. *Letter from Commerce to POSCO* (June 25, 1996), at 7, P.R. Doc. 283, Pl.'s App., Tab 22, at 2. Requested data included profitability figures for home market, U.S., and third-country sales which Commerce intended to use to reconcile submitted per-unit costs with POSCO's cost of manufacturing statement. *Id.* at 8, Pl.'s App., Tab 22, at 3. POSCO provided Commerce with all requested information, including a profitability analysis for home market, U.S., and third-country sales. *POSCO's Cost Verification Report,* at Ex. 9, C.R. Doc. 26, Def.'s Conf. App. ("Exhibit 26").

After the *Preliminary Results* were published, Domestic Producers claimed that Exhibit 26 showed POSCO's reported costs to be lower than those recorded in its financial statement by a small percentage.[34] *Petitioner's POSCO Case Brief,* at 69, C.R. Doc. 226, Def.'s Conf.App., Ex. 3, at 21. Domestic Producers argued before Commerce that, consistent with Commerce's prior practice, POSCO's reported costs should be increased accordingly. *Id.* at 69, Def.'s App., Ex. 3, at 21.

POSCO then explained that Domestic Producers' analysis of Exhibit 26 was flawed because it compared the sales period of review (August 1, 1994 to July 30, 1995) to the cost period of review (July 1, 1994 to June 30, 1995). *POSCO's Rebuttal Brief,* at 119, C.R. Doc. 435, Def.'s App., Ex. 7, at 22. POSCO further clarified that Exhibit 26 contained estimated third country sales figures based on POSCO's home market sales product distribution because the records it kept did not correspond exactly with Commerce's preferred methodology. *Id.* at 120, Def.'s App., Ex. 7, at 23. Thus, an exact match between sales and costs figures was not possible. *Id.*

Commerce decided not to adjust POSCO's reported costs, explaining that

> the reconciliation provided by the POSCO group establishes that the reported costs are not understated .... [and] that the

format of the reconciliation necessarily would not result in a perfect match of reported costs to the financial statement, but ... that the reconciliation did indicate that all costs are captured.

*Final Results,* 62 Fed.Reg. at 18429.

### Discussion

Domestic Producers contend that Commerce lacked substantial evidence for its conclusion that the cost of manufacturing as reported in POSCO's financial statements reconciles with the cost of manufacturing data POSCO provided Commerce. Commerce used as evidence an explanation provided by POSCO at the administrative hearing after the Preliminary Results were published in response to Domestic Producers' challenge that the costs did not reconcile. Specifically, Domestic Producers argue that Commerce is precluded from considering as evidence an explanation proffered after publication of its Preliminary Results because the record was then closed. Domestic Producers further assert that, even if Commerce might consider it, the POSCO Group's explanation is not substantial evidence because it is a self-serving statement. The court disagrees with Domestic Producers and sustains Commerce's determination that POSCO's costs reconcile.

 Domestic Producers' are not independent investigators with power to re-verify Commerce's verification. *Micron Technology, Inc. v. United States,* 19 CIT 829, 850, 893 F.Supp. 21, 40 (1995). They may not usurp Commerce's role as fact-finder and substitute their analysis of POSCO's cost data for the result reached by Commerce in the Verification Report. Moreover, the court will not supersede Commerce's conclusions so long as it "applies a reasonable standard to verify materials submitted and the verification is supported by such relevant evidence as a reasonable mind might accept." *Hercules, Inc. v. United States,* 11 CIT 710, 726, 673 F.Supp. 454, 469 (1987) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197,

---

**34.** Domestic Producers claimed that Exhibit 26 showed POSCO's reported costs to be lower than those recorded in its financial statement by [ ] percent.

229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). At verification, Commerce conducted numerous sales traces which it described in detail. *POSCO Cost Verification Report* at 22–24, P.R. Doc. 343, Def.'s App., Ex. 30, at 2–4. The court finds that Commerce applied a reasonable verification standard and had substantial evidence to support its results. *See Micron*, 893 F.Supp. at 40.

Had Commerce sought information at verification that POSCO failed to provide, POSCO would not have been allowed to submit that information at the administrative hearing. Here, however, Domestic Producers first challenged Exhibit 26 at the administrative hearing itself, claiming their analysis showed that POSCO under-reported its costs. *See Petitioner's POSCO Case Brief*, at 69, Def's Conf.App., Ex. 3, at 21. To respond effectively, POSCO had to provide information in its Rebuttal Brief for which Commerce had never asked before or during verification. Because *Commerce* found no discrepancy at verification, POSCO did not *then* notify Commerce of the thirdcountry sales assumptions inherent in Exhibit 26. Presumably, had Commerce discovered the discrepancy in spot checks and asked for an explanation, POSCO would have submitted the same information at verification rather than in its Rebuttal Brief. Instead, POSCO first became aware that reconciliation was in dispute upon receiving a copy of Domestic Producers' Case Brief, by which time the record was closed. The court will not penalize POSCO for not having submitted information during verification that it was not then aware it needed to provide. Under these exceptional circumstances, the court sustains Commerce's use of POSCO's explanation as record evidence.

As noted, Domestic Producers also challenge POSCO's explanation of the cost discrepancy as a self-serving statement unfit for use by Commerce as substantial evidence. *See Carlisle Tire & Rubber Co. v. United States*, 9 CIT 520, 533, 622 F.Supp. 1071, 1082 (1985); *see also Micron*, 893 F.Supp. at 27–28. In *Carlisle*, the court rejected as substantial evidence a letter from defendant's counsel describing a verification procedure Commerce had failed to describe in its verifi-

cation report. *Carlisle*, 622 F.Supp. at 1082. Such a self-interested statement could not be relied on to fill a critical gap in the description of Commerce's verification procedure. *Id.* In *Micron*, plaintiff attempted to justify Commerce's choice of a disputed cost allocation methodology with reference to a single remark made by its representative at the administrative hearing. *Micron*, 893 F.Supp. at 27. The court rejected plaintiff's argument:

> Standing alone, this statement offered by a self-interested party after the record had been closed hardly constitutes substantial evidence upon which Commerce could base so sweeping a determination.

*Id.* at 27–28.

Neither *Carlisle* nor *Micron* stands for the proposition that self-serving statements *per se* may not be used as evidence. To the contrary, a self-interested statement can be relied upon as evidence, so long as it is not contradicted by "harder" evidence, such as objectively verifiable facts. *See Healey v. Chelsea Resources Ltd.*, 947 F.2d 611, 620 (2nd Cir.1991) ("The fact that such testimony may be self-serving goes to its weight rather than to its admissibility.").

Here, Commerce has described in detail its trace of POSCO's manufacturing costs, *POSCO Verification Report*, at 22–24, Def.App., Ex. 30, at 2–4, while in *Carlisle* it left out a detail critical to its analysis. 9 CIT at 533, 622 F.Supp. at 1082. POSCO's evidence is not meant to redeem Commerce from its failure to submit a complete Verification Report. Commerce's determination that POSCO's costs reconcile is based on a thorough Verification Report. POSCO's explanation provides a reasonable basis for Commerce to reject Domestic Producers' challenge to Exhibit 26. By contrast with *Micron*, POSCO's explanation is not one offered by a self-interested party to compensate for an utter lack of evidence for Commerce's determination. *See Micron*, 893 F.Supp. at 27. For these reasons, the court finds that Commerce's use of POSCO's explanation as substantial evidence for its determination was reasonable and in accordance with law.

## VI. Dongbu's Warehousing Expenses
### Background

Prior to export, in its warehouse in the port city of Incheon, Dongbu briefly stores unpainted cold-rolled merchandise produced at its factory in Seoul. *Dongbu's Supp. Questionnaire Response* (March 1, 1996), at 79, P.R. Doc. 148, Pl.'s App., Tab 16, at 4. Dongbu explained to Commerce that warehousing is necessary because the factory is far from the port. *Letter from Union to Commerce* (March 28, 1996), at 15, P.R. Doc. 179, Def.'s App., Ex. 31, at 2. Commerce verified that Dongbu reported the warehousing costs as part of manufacturing costs, *HM Verification Report* (Aug. 22, 1996), at 38, P.R. Doc. 327, Def.'s App., Ex. 3, at 3, and accepted this designation in its *Final Results*, 62 Fed.Reg. at 18425.

Domestic Producers argued to Commerce that Dongbu failed to report the pre-sale warehousing expense as an expense "incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States," as required by 19 U.S.C. § 1677a(c)(2)(A). *Letter from AK Steel to Commerce* (Sept. 5, 1996), at 12–13, P.R. Doc. 345, Def.App., Ex. 33, at 2–3. Domestic Producers claimed that the date crucial to the antidumping analysis is the date of shipment from the factory to the warehouse, not the date of shipment from the warehouse itself, and further, that Dongbu had "admitted warehousing *finished* products after production is completed and after shipment from the production facility." *Letter from AK Steel to Commerce* (Dec. 2, 1996), at 19, P.R. Doc. 415, Def.App., Ex. 5, at 17. Domestic Producers thus recommended to Commerce that it consider Dongbu's data to be flawed and instead resort to facts available which could be derived from the warehousing expense data provided. *Id.* at 20, Def.'s App., Ex. 5, at 18.

Commerce declined to make the downward adjustment recommended by Domestic Producers, and stated that Dongbu indicated that the warehousing expenses in question are not treated as selling expenses, but rather as cost of manufacturing expenses. [Commerce] noted in the same [verification] report that, as such, the amounts reported in Dongbu's questionnaire response of May 24, 1996, and the method of allocating these expenses, were shown during Dongbu's cost verification to tie directly to audited financial statements. Therefore, as in the preliminary results of these reviews, we have continued to treat these expenses as manufacturing overhead expenses, and we have not deducted them from U.S. price for the final review results.

*Final Results,* 62 Fed.Reg. at 18425.

### Discussion

Domestic Producers contend that Commerce erred by classifying Dongbu's Incheon warehousing expenses as a manufacturing cost. Defendant and Domestic Producers now request a remand to reclassify Dongbu's warehousing expenses under 19 U.S.C. § 1677a(c)(2)(A). Warehousing that occurs at a site other than the merchandise's place of production, Domestic Producers argue, is properly classified as a movement expense. 19 U.S.C. § 1677a(c)(2)(A).

The court does not need to decide this issue because, as all parties agreed at oral argument, the dollar amount at the core of this dispute is quite small. If an error did occur, it was harmless error. Therefore, although Defendant acknowledges that an error may have occurred, the court does not remand because, alone, a reclassification of the warehousing expenses will not result in an adjustment of Dongbu's dumping margin. Accordingly, the court sustains Commerce's determination in all respects.